**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| STERLING CURRENCY GROUP LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:12-CV-03022-RWS |
| | : | |
| JAMES MAURER and MONETIZERS LLC, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on the Motion to Dismiss [11] of

Defendants James Maurer and Monetizers LLC and the Motion to Conduct

Jurisdictional Discovery [14] and the Motion for Leave to Amend the

Complaint [16] of Plaintiff Sterling Currency Group LLC.  After reviewing the

record, the Court enters the following Order.

### Background

This is a trademark infringement action brought by Plaintiff Sterling

Currency Group LLC ("Sterling") against Defendants James Maurer and

Monetizers LLC ("Monetizers").  Sterling alleges in its First Amended

AO 72A
(Rev.8/82)

Complaint[1] that it is a money services business, which buys and sells foreign currencies, including primarily the Iraqi Dinar, to the general public through its websites.  (Pl.'s First Am. Compl. ("Compl."), Dkt. [2] ¶¶ 22, 30.)  Sterling operates its business through the websites, "SterlingCurrencyGroup.com" and "DinarBanker.com."  (Id. ¶ 1.)  Sterling uses the marks STERLING CURRENCY GROUP,  STERLINGCURRENCYGROUP.COM, DINAR BANKER, and DINARBANKER.COM.  (Id. ¶¶ 6-8).

In order to promote its business, Sterling relies heavily on its organic search rankings with Google.  (Id. ¶ 31.)  These organic search rankings are search engine results pages that appear because of their relevance to the search terms and not due to advertisements.  (Id. ¶ 31 n.2.)

For many years, Google ranked a website higher and considered it to be important if links to that particular website appeared on many other websites. (Id. ¶ 32.)  Thus, a website with many links was ranked higher by Google than similar websites with fewer links. (Id.)  The industry developed ways to

---

[1] Plaintiff amended its complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A), which allows a plaintiff to amend the complaint once as a matter of course within twenty-one days after serving it.

2

artificially post many links to websites. (<u>Id.</u> ¶33.)[2]  Google caught on to this

practice and stopped using the number of links to determine a website's ranking

or importance.  (<u>Id.</u> ¶ 34.)  Additionally, Google started punishing websites that

it believed had engaged in this practice of artificial linking or "bad links."  (<u>Id.</u> ¶

35.)  The punishment was for Google to significantly lower a website's ranking,

resulting in that website being shown much lower on Google's results pages

and fewer Google users seeing the listing for that website.  (<u>Id.</u>)

Google's punishments became known throughout the industry.  Some

individuals learned that they could take advantage of Google's new policy by

running campaigns to place artificial links to their competitor's websites.  (<u>Id.</u> ¶

36.)  This is known as "Google Bowling."  (<u>Id.</u>)  The result is that the

competitor's site will be punished by Google for having the bad links and will

be listed lower on Google's rankings.  (<u>Id.</u>)

---

[2] One example of this is where the owner of a website creates artificial links to
other websites and then links these artificial links to their own website.  (<u>Id.</u> ¶ 33.)
Thus, the owner would create many artificial websites with the sole purpose of using
those sites to post links to the owner's website.  (<u>Id.</u>)

Plaintiff alleges that Defendants run a variety of informational websites, including one on the Iraqi Dinar at "IraqiDinar.com."[3] (Compl., Dkt. [2] ¶ 37.) Plaintiff alleges that in or about April 2012, Defendants started posting artificial links to Sterling's websites using a linking network called "Link-Vault.com." (Id. ¶ 39.) Plaintiff asserts that Defendants undertook this campaign knowing that these artificial or bad links would cause Google to punish Sterling's website. (Id.) As a result, Defendants caused at least 500 bad links to be posted against Sterling's website. (Id. ¶ 40.)

Plaintiff alleges that as a result of Defendants' bad links campaign, Sterling's websites appeared much lower on Google's results pages. (Id. ¶¶ 44-45.) This resulted in a rapid decline in the visibility of Sterling's websites and a significant drop in the number of visitors to Sterling's sites and the number of sales. (Id.) Plaintiff alleges that Defendants benefitted from lowering the high rankings of Sterling's websites because more Google users would see and visit

---

[3] Plaintiff alleges in the First Amended Complaint that Defendants' website is both "Iraqidinar.com" and "IraqiDinar.org." (Id. ¶¶ 9-10.) Defendants explain in their motion to dismiss that they do not own "Iraqidinar.com" and instead own "Iraqidinar.org." (Defs.' Mem. of Law in Support of Their Mot. to Dismiss ("Defs.' Br."), Dkt. [11-1] at 4, n.3.) Based on the information provided by the parties, as well as the Court's own review of each website, the correct website for purposes of this action is "Iraqidinar.org."

Defendants' own website at Iraqidinar.org and other related Iraqi Dinar websites that Defendants may own or operate.  (Id. ¶ 41.)  Plaintiff alleges that Defendants' wrongful acts have injured Plaintiff in excess of five million dollars ($5,000,000.00).  (Id. ¶ 47.)

In its First Amended Complaint, Plaintiff brings claims against Defendants for trademark infringement, trademark dilution, tortious interference with business relations, unfair competition, fraud, injunctive relief, punitive damages, attorneys' fees, and pre- and post-judgment interest.  (Id. ¶ 3.)

Defendants now move to dismiss Plaintiff's First Amended Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  (Defs.' Mot. to Dismiss, Dkt. [11].)  In addition to filing a response to Defendants' Motion to Dismiss, Plaintiff has also filed a Motion For Permission to Conduct Jurisdictional Discovery (Dkt. [14]), and a Motion for Leave to Amend the Complaint (Dkt. [16].)

## Discussion

**I.      Defendants' Motion to Dismiss For Lack of Personal Jurisdiction Pursuant to Federal Rule Civil Procedure 12(b)(2)**

Plaintiff alleges in its First Amended Complaint that it is organized under the laws of the State of Georgia with its principal place of business in Atlanta. (Compl., Dkt. [2] ¶ 5.)  Defendant James Maurer is an individual residing in North Muskego, Michigan.  (Id. ¶ 9; James Maurer Affidavit, Dkt. [11-2] ¶ 2.) He is the agent and sole member and employee of Monetizers and the operator of the website at IraqiDinar.org. (Compl., Dkt. [2] ¶ 9; Maurer Aff., Dkt. [11-2] ¶ 4.)  Monetizers is a limited liability company organized under the laws of the State of Michigan with its principal place of business in Michigan.  (Maurer Aff., Dkt. [11-2] ¶ 3.)  Monetizers does business as IraqiDinar.org and operates a website at this internet domain name.  (Compl., Dkt. [2] ¶ 10.)

To support personal jurisdiction, Sterling alleges in its First Amended Complaint that Defendants transact business within Georgia and regularly do and solicit business in Georgia.  (Id. ¶16.)  Plaintiff contends further that Defendants engage in persistent courses of conduct in Georgia or have continuous and systematic contacts with Georgia.  (Id.)  Plaintiff asserts that Defendants have committed unlawful and intentional tortious acts outside the jurisdiction of the Court with the full knowledge that their acts would cause injury in this jurisdiction.  (Id. ¶17.)  Plaintiff argues that Defendants' unlawful

6

and intentional tortious acts outside the jurisdiction of the Court have caused

injury to Sterling within the State of Georgia. (Id. ¶18.)

      "A plaintiff seeking the exercise of personal jurisdiction over a

nonresident defendant bears the initial burden of alleging in the complaint

sufficient facts to make out a prima facie case of jurisdiction." United Techs.

Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009).  "Where, as here, the

defendant challenges jurisdiction by submitting affidavit evidence in support of

its position, 'the burden traditionally shifts back to the plaintiff to produce

evidence supporting jurisdiction.'" Id. (quoting Meier ex rel. Meier v. Sun Int'l

Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002)).  "Where the plaintiff's

complaint and supporting evidence conflict with the defendant's affidavits, the

court must construe all reasonable inferences in favor of the plaintiff." Meier,

288 F.3d at 1269.

      The Court uses a two-step inquiry to determine whether personal

jurisdiction exists over a nonresident defendant.  Henriquez v. El Pais

Q'Hubocali.com, 500 F. App'x 824, 827 (11th Cir. 2012).  First, the Court must

examine whether the exercise of personal jurisdiction is appropriate under

Georgia's Long-Arm statute.  Id. at 828.  Second, the Court must determine

whether the exercise of jurisdiction violates the Due Process Clause of the

Fourteenth Amendment to the United States Constitution.  Id.

> Georgia's Long-Arm statute provides as follows:
>
> A court of this state may exercise personal jurisdiction over any
> nonresident . . . , as to a cause of action arising from any of the
> acts, omissions, ownership, use, or possession enumerated in this
> Code section, in the same manner as if he or she were a resident of
> this state, if in person or through an agent, he or she:
>
> > (1) Transacts any business within this state;
> >
> > (2) Commits a tortious act or omission within this state,
> >  except as to a cause of action for defamation of character
> > arising from the act; [or]
> >
> > (3) Commits a tortious injury in this state caused by an act
> > or omission outside this state if the tort-feasor regularly does
> > or solicits business, or engages in any other persistent course
> > of conduct, or derives substantial revenue from goods used
> > or consumed or services rendered in this state[.]

O.C.G.A. § 9-10-91.[4]  Although Defendants argue in their motion that none of

these subsections confers personal jurisdiction over them, Plaintiff responds

that personal jurisdiction is established under subsection 3.  (Defs.' Br., Dkt.

[11-1] at 13-23; Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n"), Dkt.

---

[4] The remaining three provisions of this code section are not relevant to this action because they apply to ownership of real property and domestic relations.  See O.C.G.A. § 9-10-91(4)-(6).

8

[15] at 11-18.)   Plaintiff has not contested Defendants' arguments for dismissal for lack of personal jurisdiction under subsections 1 or 2.  (Pl.'s Opp'n, Dkt. [15] at 11-18.)  Accordingly, the Court will focus only on subsection 3.

### A.  Tortious Injury

Defendants argue that Plaintiff has failed to plead that they committed a tortious act outside of Georgia that caused injury inside Georgia and instead only offers conclusory statements and legal conclusions.  (Defs.' Br., Dkt. [11-1] at 19.)  Defendants contend that Plaintiff only provided one example in its complaint of a "bad link," but that the example provides no evidence that the post on the internet was an actual link as opposed to text and there is no evidence that Defendants actually placed the link there.  (Id. at 19-20.)

In response, Plaintiff argues that it has sufficiently alleged that Defendants committed a tortious injury by alleging that trademark infringement occurred outside the state, and presumably in Michigan, where Defendants are residents.  (Pl.'s Opp'n, Dkt. [15] at 11.)  Plaintiff contends that it has sufficiently alleged that it suffered tortious injuries here in the form of economic harm in the amount of $5,000,000.00. (Id.)

9

After a review of Plaintiff's First Amended Complaint, the Court finds that Sterling has sufficiently alleged that Defendants committed a tortious injury against Sterling in Georgia in the form of economic harm caused by Defendants placing bad links to Sterling's website while outside of Georgia.

### B. Business in Georgia

Defendants argue that Plaintiff has not alleged sufficient facts to show that Defendants regularly conduct or solicit business in Georgia or that Defendants derive substantial revenue from goods used or services rendered in Georgia. (Defs.' Brief, Dkt. [11-1] at 21.) Relying on the affidavit of Mr. Maurer, Defendants argue that the only business Monetizers did with Georgia residents involved the sale of fourteen electronic books over the course of three years from 2008 - 2011. (Id. at 21; Maurer Aff. ¶ 26.) Defendants contend that the only action that could be considered solicitation is the maintenance of its website, which did not target Georgia residents. (Defs.' Brief, Dkt. [11-1] at 22.) Moreover, Defendants argue that merely maintaining a website that is accessible to Georgia residents is not regular solicitation. (Id.)

Plaintiff responds that Defendants' conduct and the interactive and commercial nature of its website demonstrate Defendants' engagement in a

10

persistent course of conduct that satisfies Georgia's Long-Arm statute. (Pl.'s

Opp'n, Dkt. [15] at 13, 15.)  Plaintiff contends that Defendants regularly

conducted and solicited business in Georgia as evidenced by the fourteen

electronic books Defendants sold through their website to Georgia residents.

(Id. at 16.)  Plaintiff avers that Defendants conduct business with Google and

depend on Google for the success of their website.  (Id.)  Furthermore, Plaintiff

argues that Defendants' other business activities are connected to Georgia, and

their past dealings with Sterling, including communications with Sterling's

agent, meet the requirements of O.C.G.A. § 9-10-91(3).  (Id.)

        In response to Plaintiff's arguments, Defendants reply that Plaintiff's

cause of action is completely unrelated to the interactive and commercial nature

of Defendants' website.  (Defs.' Reply Mem. of Law in Support of Their Mot.

to Dismiss ("Defs.' Reply), Dkt. [18] at 4, 9.)  Defendants assert that any sales

of electronic books to Georgia residents were *de minimis* and did not generate

substantial revenue.  (Id. at 9.)  Defendants contend further that none of the

minimal contacts Defendants had with Plaintiff, Georgia, or Google give rise to

personal jurisdiction.  (Id. at 11.)  Finally, Defendants assert that all of

Plaintiff's arguments relate solely to Mr. Maurer's actions taken on behalf of

AO 72A
(Rev.8/82)

Monetizers, and there is no allegation that Mr. Maurer conducted any business or derived any revenue as a result of actions he took individually on his own behalf.  (Id. at 13-14.)

The Court finds that Plaintiff has failed to establish personal jurisdiction over Defendants.  First, on behalf of Monetizers, as its sole member and employee, Mr. Maurer states that Monetizers has never been registered to do business in Georgia, and it has never owned real property, had an office, kept a financial account, or maintained any phone listing here.  (Maurer Aff. ¶¶ 6-9.) He explains further that Monetizers has never transacted business with Plaintiff and does not regularly transact or solicit business in Georgia.  (Id. at ¶ 14.) Additionally, Monetizers does not derive any revenue from selling goods or rendering services in Georgia.[5] (Id. at ¶ 15.)  Plaintiff has not pointed to evidence to show otherwise.

Second, Defendants' maintenance of a website that is accessible to Georgia residents is not the regular solicitation of business.  See Jordan Outdoor Enterprises, Ltd. v. That 70's Store, LLC, 819 F. Supp. 2d 1338, 1345 (M.D.

---

[5] As discussed more fully infra, Monetizers does not derive any revenue from selling electronic books.  (Id. at ¶¶ 29, 30).

12

Ga. 2011) (rejecting the argument that a defendant regularly solicits business in Georgia by operating websites that are accessible in Georgia as well as everywhere else).

Third, in a case such as this where Plaintiff relies on specific, rather than general, jurisdiction, "[i]t is well established that in order for the minimum contacts requirement to be met, the contacts must be related to the plaintiff's cause of action." Barton S. Co., Inc. v. Manhole Barrier Sys., Inc., 318 F. Supp. 2d 1174, 1178 (N.D. Ga. 2004); see also Sloss Indus. Corp. v. Eurisol, 488 F.3d 922, 925 (11th Cir. 2007).

Plaintiff argues that the section of Defendants' website that allowed for individuals to make comments and to communicate with Defendants and each other satisfies the statute because this constitutes an interactive website on which a visitor can exchange information with a host computer.[6]  (Pl.'s Opp'n, Dkt. [15] at 14.)  Plaintiff asserts that Defendants' website is also interactive because visitors can access various calculators to assess Iraqi Dinar purchases that they have already made or are contemplating making.  (Id. at 15.)  Plaintiff

---

[6] Plaintiff states that the "comments" feature of Defendants' website has now been removed.  (Id. at 14. n.3.)

contends that although visitors are not making purchases through the site, their interactions with the site may determine whether they enter into subsequent transactions to buy or sell Iraqi Dinar, which constitutes commerce. (Id.)

The Court, however, finds that Plaintiff's cause of action for bad links is not related to the comments section and calculator of Defendants' website. Those individuals who chose to post a comment or used the calculator had nothing to do with the alleged posting of bad links. See Schutz Container Sys., Inc. v. Mauser Corp., No. 1:09-CV-03609-RWS, 2010 WL 5087865, at *3 (N.D. Ga. Dec. 7, 2010) (interactivity of website was insufficient to establish personal jurisdiction because the cause of action was not related to the interactive nature of the website); Imageline, Inc. v. Fotolia LLC, 663 F. Supp. 2d 1367, 1376 (N.D. Ga. 2009) (no personal jurisdiction over website operator where the cause of action was not related to the interactive nature of the website).

Additionally, Plaintiff argues that the commercial nature of Defendants' website, through the selling of electronic books and advertisements, satisfies Georgia's Long-Arm statute. Mr. Maurer states that the website generates revenue in two ways: (1) revenue from the selling of electronic books

14

containing cautionary information regarding the Dinar; and (2) advertising revenue.  (Maurer Aff. ¶ 21.)  With regard to the books, Mr. Maurer explains in his affidavit that from October 2008 until June 2012 Defendants' website offered electronic books for sale through a third-party vendor.  (Id. ¶ 26.)[7] During this period, a total of 1,427 books were sold, with only fourteen books being sold to Georgia residents.  (Id.)  This amounts to less than 1% of all book sales being sold to Georgia residents.  (Id.)  Mr. Maurer states that the total amount of revenue generated for all fourteen books sold to Georgia residents was less than 1% of the total revenue generated during the period the books were available for sale.  (Id. at 27.)  Mr. Maurer affirms that neither he nor Monetizers had any direct contact with the purchasers of the electronic books and that the third-party vendor collected payments and delivered the books.  (Id. at 29.)  This third-party vendor then sent a percentage of sale proceeds to non-party James Maurer LLC.  (Id.)

      Based on this evidence, the Court finds that those individuals who purchased an electronic book from Defendants' website have no relation to Plaintiff's claims against Defendants for posting bad links.  Moreover,

---

[7] The website no longer offers electronic books for sale.  (Id.)

Monetizers has not sold an electronic book to any Georgia resident since May 2011, which is almost an entire year before Sterling alleges that Defendants began their bad link campaign.  (Defs. Brief, Dkt. [11-1] at 21-22; Maurer Aff. ¶ 26.)

With regard to advertisements, Mr. Maurer states that Monetizers obtains advertisers for the website through Google Adsense, which allows Google to provide Monetizers with a code that Monetizers inserts into the website. (Maurer Aff. ¶ 22.)  Google is then able to place ads on the website without any further input from Monetizers.  (Id.)  Plaintiff has failed to show any relation between its allegations of a bad link campaign and advertisements on Defendants' website.

Fourth, Plaintiff and Defendants rely on the sliding scale test from Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D. Pa. 1997), to argue their respective positions on jurisdiction.  The court in Zippo distinguished among three categories of websites:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a

16

defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

952 F. Supp. at 1124.[8]

Defendants' website falls into the middle ground: it is an interactive website where users can exchange information with the host computer, whether to buy a book, post a comment, or use a calculator.  Therefore, the Court will examine the level of interactivity and commercial nature of Defendants' website.  See Imageline, Inc., 663 F. Supp. 2d at 1377.

_____

[8] As the Court has recognized, the "Eleventh Circuit has not stated whether the Zippo 'sliding scale' test applies in determining when specific jurisdiction exists over nonresident defendants that operate primarily on the Internet." Imageline, Inc., 663 F. Supp. 2d at 1376 n.7 (citing Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1220 n.26 (11th Cir. 2009)).  Nevertheless, the Court will address the parties' arguments under this test even though it has not yet been expressly adopted in this circuit.  See Imageline, Inc., 663 F. Supp. 2d at 1376 n.7

17

The Court finds that the commercial nature as well as the level of interactivity are low.  As Mr. Maurer states in his affidavit, the purpose of Defendants' website is to provide information to the general public about the risks of purchasing the Iraqi Dinar currency, and therefore, the interactive and commercial components are not the primary purposes of the website.  (Maurer Aff. ¶¶ 19-20.)  The website does not offer Iraqi Dinar for sale.  (Id.)  The purpose is not to engage in commercial transactions or share files over the Internet.  (See id.)   Additionally, the exchange of information, such as posting comments and using the calculator, are not commercial but rather informational. The sharing of information does not make website operators subject to jurisdiction wherever the public may view such information.  See Barrett v. Catacombs Press, 44 F. Supp. 2d 717, 731 (E.D. Pa. 1999) (noting that "the exercise of personal jurisdiction over non-commercial on-line speech that does not purposefully target any forum would result in hindering the wide range of discussion permissible" on the internet).

Furthermore, the sale of fourteen books represents a low level of commercial activity with Georgia residents over the span of three and a half years.  Moreover, there is no evidence that Defendants' website specifically

18

targeted or solicited Georgia residents.  Thus, under the <u>Zippo</u> sliding scale,

Defendants' website does not establish personal jurisdiction over Defendants.

Fifth, based on the evidence provided, Defendants' selling of electronic

books to Georgia residents was not regular, and Defendants did not derive

substantial revenue from this commercial activity.  <u>See</u> <u>Sol Melia, SA v. Brown</u>,

301 Ga. App. 760, 767 (2009) (finding 0.1% revenue from Georgia residents to

be insubstantial).  In fact, Mr. Maurer states that neither he nor Monetizers ever

received any revenue from the sales of the electronic books or any other goods

or services.  (Maurer Aff. ¶ 30.)

Sixth, as for Plaintiff's advertisements that appear on Defendants'

website, Plaintiff asserts that Defendants did business with Plaintiff by allowing

Sterling's advertisements to appear on Defendants' website.  (Pl.'s Opp'n, Dkt.

[15] at 16.)  Plaintiff contends that Defendants could have blocked these ads but

chose not to do so, and therefore, Defendants knowingly accepted revenue from

Sterling by placing Sterling's ads on their website.  (<u>Id.</u> at 17.)  Additionally,

Plaintiff notes that Defendants gained credibility and revenues from increased

traffic by having Plaintiff's advertisements on Defendants' website.  (<u>Id.</u>)

19

Mr. Maurer states in his affidavit that neither he nor Monetizers had any direct contact with any advertiser, including Plaintiff, and instead placed advertisements through Google Adsense.  (Maurer Aff. ¶¶ 22-23.)  Additionally, neither Mr. Maurer nor Monetizers received any revenue from the website.  (Id. ¶ 23.)  Instead, all revenue was received by non-party James Maurer LLC.  (Id.)

The Eleventh Circuit has found that the "fact that a particular website displays an advertisement that is viewable in Georgia or shows a company that does business in Georgia does not, by itself, mean that the website owner had any contact with Georgia." Henriquez, 500 F. App'x at 829.  Therefore, the Court finds that Defendants' website's display of advertisements viewable in Georgia or featuring companies, such as Plaintiff, who do business in Georgia, is insufficient to establish personal jurisdiction over Defendants.[9]

Seventh, Plaintiff contends that the Court has personal jurisdiction over Defendants because Defendants have a business relationship with Google and

---

[9] The parties dispute whether Defendants had control to block certain advertisements, such as the ones from Sterling.  In light of the Eleventh Circuit's finding in Henriquez, whether Defendants could have blocked the advertisements from appearing on Defendants' website is irrelevant. 500 F. App'x at 829.

20

Google has an office in Georgia.  (Pl.'s Opp'n, Dkt. [15] at 16.)  "Because Google has both a large office in Atlanta and one of its six North American data centers just outside of Atlanta, it is highly likely that Defendants' exchanges with Google, the ads that appear on Defendants' Website and/or the income that Defendants' Website generates have regular contact with Google in Georgia." (Id. at 16.)  Therefore, Plaintiff asserts that Defendants conduct regular business in Georgia.  (Id.)

This argument was rejected in Celorio v. Google Inc., 872 F. Supp. 2d 1327 (N.D. Fla. 2012) report and recommendation adopted, No. 1:11CV79-SPM/GRJ, 2012 WL 1795213 (N.D. Fla. May 17, 2012).  In that case, the plaintiff argued that personal jurisdiction was established over the defendants because the defendants had a business relationship with Google and Google did business in Florida.  Id. at 1333.  The court found that the defendants and Google had "agreed to an independent contractor relationship, and to extend jurisdiction in Florida to any company that contracts with Google, an international corporation, would thwart the due process protections that underlie the personal jurisdiction analysis."  Id. at 1333-34.  This Court agrees. The Court finds that any contact between Google and Defendants is not

sufficient to show that Defendants regularly do or solicit business in Georgia or engage in a persistent course of conduct in Georgia.

Eighth, the only evidence of any contact between Plaintiff and Defendants is when Plaintiff's agent made an offer to purchase Defendants' website in 2009.  (Maurer Aff. ¶ 31.)  Mr. Maurer explains that Plaintiff's agent initiated the communications and telephoned him with the offer, which he then declined on behalf of Monetizers.  (Id.)[10]  This minimal contact is not sufficient to establish personal jurisdiction over Defendants.

Finally, Plaintiff has sued Mr. Maurer individually.  To be clear, the discussion above concerns actions Mr. Maurer took on behalf of Monetizers.  A "nonresident individual cannot be subject to personal jurisdiction based solely upon acts in Georgia taken in his or her corporate capacity."  Hi-Tech Pharmaceuticals, Inc. v. Demelo, No.1:07-CV-1934-RWS, 2009 WL 901156, at *3 (N.D. Ga. Mar. 31, 2009) (quotation omitted).  Instead, "[c]orporate officers are only individually subject to jurisdiction if engaging in business transactions

---

[10] Mr. Maurer states that the same individual contacted him again in 2011 about buying Defendants' website, but at that time, he informed Mr. Maurer that he was no longer affiliated with Plaintiff.  (Maurer Aff. ¶ 32)  Even if he had been still affiliated, this communication is insufficient to establish personal jurisdiction.

22

on their own behalf and for their own 'substantial financial benefit,' rather than engaging in strictly corporate acts on behalf of the corporation."  Id.

Mr. Maurer states that he has never been a resident of Georgia, and he has never owned property, had an office, kept any financial account, or had a phone listing in Georgia.  (Maurer Aff. ¶¶ 5, 7-9.)  In fact, Mr. Maurer has only visited Georgia once, during a brief layover at the airport.[11]  (Id. ¶ 10.)  He has never done business in Georgia or transacted business with any Georgia resident. (Id. ¶¶ 11-12.).  Additionally, he states that he has never solicited business in Georgia or derived any revenue from selling goods or rendering services in Georgia.  (Id. ¶ 13.)   Therefore, the Court has no personal jurisdiction over Mr. Maurer individually.  See Hi-Tech Pharmaceuticals, Inc., 2009 WL 901156, at *3-4.

For all of these reasons, the Court finds that it does not have personal jurisdiction over Defendants under Georgia's Long-Arm statute.  Therefore, the Court need not determine whether jurisdiction is proper under the Due Process Clause.  See Henriquez, 500 F. App'x at 829.

---

[11] During this layover, he did not perform any actions related to Iraqidinar.org, and the trip was not related to transacting any business for himself or Monetizers. (Id. ¶ 10.)

23

II.     **Plaintiff's Motion for Permission to Conduct Jurisdictional Discovery**

Throughout Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, Plaintiff requests an opportunity to conduct jurisdictional discovery. (Dkt. [15] at 5-7, 15-16.)  Plaintiff has also made a separate Motion For Permission to Conduct Jurisdictional Discovery.  (Dkt. [14].)  In the motion, Plaintiff requests that if the Court does not deny Defendants' Motion to Dismiss (Dkt. [11]), that the Court grant Plaintiff an opportunity to conduct jurisdictional discovery so that the Court can make a ruling based on all facts relevant to personal jurisdiction.  (Pl.'s Mot. to Conduct Jurisdictional Discovery ("Pl.'s Disc. Mot."), Dkt. [14] at 14.)

"The plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction."  Henriquez, 500 F. App'x at 830. "Nonetheless, a district court may properly refuse or limit jurisdictional discovery if the plaintiff has not made a sufficient showing that there may be a basis for exercise of jurisdiction, or if the proposed discovery seems unlikely to shed light on the jurisdictional question." Cold Smoke Capital, LLC v. Gross, No. 1:11-CV-3558-WSD, 2012 WL 3612626, at *8 (N.D. Ga. Aug. 21, 2012)

24

(quoting Charles Alan Wright et al., 8 <u>Federal Practice and Procedure</u> § 2008.3 (2010)).  Moreover, "a district court does not abuse its discretion in dismissing the plaintiff's action for lack of personal jurisdiction, even before jurisdictional discovery occurs, when the plaintiff has not diligently pursued such discovery despite the opportunity to do so."  <u>Henriquez</u>, 500 F. App'x at 830.  "The purpose of jurisdictional discovery is to ascertain the truth of the allegations or facts underlying the assertion of personal jurisdiction. It is not a vehicle for a fishing expedition in hopes that discovery will sustain the exercise of personal jurisdiction."  <u>Atlantis Hydroponics, Inc. v. Int'l Growers Supply, Inc.</u>, 915 F. Supp. 2d 1365 (N.D. Ga. 2013) (quotation omitted).

As discussed above, the Court has found that Plaintiff failed to make a prima facie showing of personal jurisdiction over Defendants based on the allegations in Plaintiff's First Amended Complaint.  The jurisdictional facts are not in dispute.  Accordingly, Plaintiff does not have a right to conduct jurisdictional discovery.  See <u>Cold Smoke Capital, LLC</u>, 2012 WL 3612626, at *8 (denying request to conduct jurisdictional discovery where the plaintiff failed to make a prima facie showing of personal jurisdiction and the jurisdictional facts were not in dispute).

25

Nevertheless, the Court will address the merits of the parties' arguments. In both its Opposition to Defendants' Motion to Dismiss and Reply in Support of its Motion to Conduct Jurisdictional Discovery, Plaintiff contends that jurisdictional discovery would show whether Defendants obtained the information for its website from sources within Georgia.  (Pl.'s Opp'n at 5; Pl.'s Reply in Supp. of Mot. for Jurisdictional Disc., Dkt. [20] at 4-5.)  Even if discovery would show this, Plaintiff has not shown how this information would establish that Defendants meet O.C.G.A. § 9-10-91(3).  Plaintiff also seeks information about whether the individuals posting comments on Defendants' website are residents of Georgia.  (Pl.'s Opp'n at 6; Pl.'s Reply in Supp. of Mot. for Jurisdictional Disc., Dkt. [20] at 5.)  However, the Court has already found that the comments section of Defendants' website has a low level of interactivity, is not related to Plaintiff's cause of action, and is informational rather than commercial.  Therefore, the residency of the posters will not lead to establishing jurisdiction.

Plaintiff also seeks information about the direct impact Google's data center in Georgia and Atlanta office had on Defendants and information related to Defendants' Google Adsense account for placing advertisements.  (Pl.'s

26

Opp'n at 7; Pl.'s Reply in Supp. of Mot. for Jurisdictional Disc., Dkt. [20] at 6.)
Again, the Court has found that Defendants' relationship with Google does not
confer personal jurisdiction over Defendants and the fact that Defendants'
website displays an advertisement that is viewable in Georgia or shows a
company that does business in Georgia is not sufficient to establish the
necessary contacts in Georgia.  Therefore, additional discovery on these issues
is unwarranted.

Furthermore, Plaintiff seeks information about the other websites
Defendants operate, these websites' contacts with Georgia, and whether these
websites regularly conduct business in Georgia.  (Pl.'s Opp'n at 7; Pl.'s Reply
in Supp. of Mot. for Jurisdictional Disc., Dkt. [20] at 7.)  Mr. Maurer states in
his affidavit that Monetizers owns BadBedBugs.com and Bed-Bugs.org, which
are websites that provide do-it-yourself information to consumers and assist
consumers with locating professional exterminators.  (Maurer Aff. ¶ 35.)
Plaintiff has not shown how facts about Defendants' other, unrelated websites
are likely to shed light on the jurisdictional question here, and instead, the Court
finds that allowing Plaintiff to conduct this discovery would amount to a fishing
expedition.

AO 72A
(Rev.8/82)

Finally, in its original Motion to Conduct Jurisdictional Discovery, Plaintiff makes conclusory requests for discovery of: (1) Defendants' contacts and transactions of business in Georgia; (2) Defendants' knowledge of Plaintiff and its location in Georgia; (3) the harm Defendants intended by placing the bad links; (4) the other contacts Defendants have with Georgia; and (5) Defendants' knowledge of Plaintiff's location prior to undertaking the bad links campaign. (Pl.'s Disc. Mot., Dkt. [14] at 4.)  These requests fail to suggest with reasonable particularity the possible existence of contacts between Defendants and Georgia sufficient to justify permitting discovery.  See Schutz Container Sys., Inc., 2010 WL 5087865, at *4.  The Court finds that none of these topics are likely to shed light on the jurisdictional question, and the Court will not permit Plaintiff to engage in a fishing expedition based on Plaintiff's hunch about certain facts.  See Atlantis Hydroponics, Inc., 915 F. Supp. 2d at 1365. Accordingly, the Court denies Plaintiff's request to conduct jurisdictional discovery.

## III.   Plaintiff's Motion for Leave to Amend the Complaint

Plaintiff moves for leave to amend its complaint to add James Maurer LLC as a defendant pursuant to Fed. R. Civ. P. 15(a)(2).  (Dkt. [16].)  Under

this Rule, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).  However, the Court "may deny leave to amend on numerous grounds, including the futility of the amendment." Patel v. Ga. Dep't BHDD, 485 F. App'x 982, 982 (11th Cir. 2012).  "Futility justifies the denial of leave to amend where the complaint, as amended, would still be subject to dismissal."  Id.

Plaintiff makes the same arguments for finding personal jurisdiction over James Maurer LLC as it did for finding jurisdiction over Defendants, and therefore, Plaintiff seeks jurisdiction over a non-resident pursuant to subsection 3 of Georgia's Long-Arm statute.  (Pl.'s Reply in Supp. of Mot. for Leave to Amend, Dkt. [21] at 4-5.)  The Court has found above that those arguments do not show personal jurisdiction over Defendants, and the Court's analysis applies equally to James Maurer LLC.

The one additional argument Plaintiff makes is that James Maurer LLC receives the revenue generated by Defendants' website.  (Pl.'s Mot. for Leave to Amend, Dkt. [16] at 3; Pl.'s Reply in Supp. of Mot. for Leave to Amend, Dkt. [21] at 3-4.)  As the Court has explained above and as Mr. Maurer states in

29

his affidavit, Defendants' website generates revenue in two ways: (1) selling electronic books; and (2) selling advertisement space.  (Maurer Aff. ¶ 21.)

The revenue received by James Maurer LLC for the fourteen books sold to Georgia residents was less than 1% of total revenue.  This is not sufficient to meet the substantial revenue requirement.  See O.C.G.A. § 9-10-91(3).

Plaintiff has not alleged any facts to show that the revenue James Maurer LLC received from advertisements featuring Georgia companies or targeting Georgia residents was substantial.  As explained above, the fact that Defendants' website displayed an ad for Sterling does not, by itself, mean that the website owner had any contact with Georgia.  See Henriquez, 500 F. App'x at 829.  Mr. Maurer states in his affidavit that Google collects payments from advertisers who choose to place their advertisements on the website, and then Google sends a percentage of those payments to James Maurer LLC on a monthly basis. (Maurer Aff. ¶ 23.)  Mr. Maurer particularly notes that no payments by an advertiser, including Plaintiff, are made directly to James Maurer LLC, and instead, advertisers make payments directly to Google. (Id. ¶ 25.)  Thus, there does not appear to be a connection specifically between James Maurer LLC and Plaintiff for advertisements.

30

Furthermore, Plaintiff has not shown that James Maurer LLC purposefully solicits, conducts, or engages in business with Plaintiff or other advertisers from Georgia.  Instead, the evidence shows that Monetizers obtains advertisers through Google Adsense and then Google places the ads on Defendants' website.  (Id. ¶ 22.) Even if Defendants and James Maurer LLC have control over which advertisements they showcase on their website, the Court does not find that this shows that James Maurer LLC met subsection 3 of Georgia's Long-Arm statute and had sufficient contacts with Georgia to be brought before this Court.  Plaintiff's theory would create a slippery slope of establishing personal jurisdiction over James Maurer LLC in any court based on any advertisement Defendants show on their website.

Finally, Georgia residents' purchases of electronic books from Defendants' website and advertisements on Defendant's website are not related to Plaintiff's bad links cause of action.  In fact, the fourteen books purchased by Georgia residents occurred a year and a half before Defendants' allegedly wrongful conduct.

In sum, Plaintiff has failed to show sufficient facts to establish personal jurisdiction over James Maurer LLC.  Therefore, granting Plaintiff leave to

amend its complaint to add James Maurer LLC as a defendant in this case would be futile.  See W.S. McDuffie & Assocs., P.C. v. Owens, 682 F. Supp. 1226, 1230 (N.D. Ga. 1988) (denying leave to amend the complaint because the plaintiff could not show that the court would have personal jurisdiction over the proposed defendant and therefore the amendment would be futile).

### Conclusion

In accordance with the foregoing, Defendants' Motion To Dismiss For Lack of Personal Jurisdiction [11] is **GRANTED**; Plaintiff's Motion For Permission To Conduct Jurisdictional Discovery [14] is **DENIED**; Plaintiff's Motion For Leave To Amend Complaint [16] is **DENIED**; and Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED**, this   5th   day of August, 2013.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

32